**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

ESSENCE TAYLOR and DANIEL CASHMAN
*on behalf of themselves and all other employees*
*similarly situated,*

                                        Plaintiffs,

            v.

DELTA-SONIC CAR WASH SYSTEMS, INC.,
and RONALD BENDERSON,

                                        Defendants.

**DEFENDANTS' RESPONSE
TO PLAINTIFFS' MOTION
FOR CLASS CERTIFICATION
UNDER RULE 23**

Civil Action No.
6:14-cv-06698-MAT-JWF

## INTRODUCTION

Plaintiffs Essence Taylor and Daniel Cashman have moved under Fed. R. Civ. P. 23 to certify a class of former and current employees of Delta-Sonic Car Wash Systems, Inc. on only one of their three claims. This Court should deny their motion.

Plaintiffs claim that Delta-Sonic did not give them weekly paystubs that complied with the Labor Law ("NYLL") and the Department of Labor's Miscellaneous Wage Order. Specifically, they allege that Delta-Sonic did not subtract the "tipped hourly rate" from the minimum wage rate on each paystub, even though *both* rates plainly appeared on the paystub. Significantly, however, Plaintiffs do not claim that Delta-Sonic failed to pay them at least minimum wage each and every week they worked (counting tips from customers). And Plaintiffs admit they got to keep all their tips. Instead, they claim that, because that subtraction of two numbers was not done on their paystubs, Delta-Sonic must now completely forfeit the tip credit it took against the minimum wage for every hour they worked in a "tipped" position.

Class treatment of this claim is not appropriate for numerous reasons. First, Taylor and Cashman have no standing to represent a class because they have no viable claim: as explained in Delta-Sonic's Motion for Summary Judgment [Dkt. 48], filed contemporaneously with this

8541632

Opposition, their imaginary forfeiture-of-tip-credit remedy does not exist, and it never has. Nothing in New York law conditions taking the tip credit on including the subtraction of the tipped rate from the minimum wage rate on each and every paystub.  In fact, it was not until April 2011, when the Wage Theft Prevention Act ("WTPA") became law, that the Legislature authorized a remedy—statutory damages capped at $2,500—for failing to itemize the tip credit on a paystub.  If Plaintiffs have a claim based on information on their paystubs (they don't), it is under the WTPA.  Plaintiffs never invoked the WTPA, either in their Complaint or class motion.

Second, even if Plaintiffs had a viable claim, their boilerplate motion does not meet the strict requirements of Rule 23.  For starters, they are not adequate class representatives.  Taylor remembers very little about Delta-Sonic's tip practices, and her misconduct while an employee seriously undermines her credibility (she consistently underreported her income), raising questions about whether she would work for the best interests of the class.  Cashman, who was not at Delta-Sonic for most of the six-year limitations period, did not even know that his case involves thousands of employees from other states.  And neither of them knew that their counsel had not moved for class certification on their other state law claim.

Moreover, Plaintiffs utterly fail to support or even explain their eligibility for (b)(1) certification, which is rarely granted.  As for (b)(2) certification, they have no right to injunctive relief, because they (like much of the proposed class) do not work at Delta-Sonic anymore.

And (b)(3) certification is foreclosed since individual issues predominate.  Indeed, Plaintiffs cannot show commonality in the first place.  The WTPA provides an ***affirmative defense*** to any alleged paystub notice violation if the employer shows the employee was paid all wages due.  Thus, any trial (assuming this Court does not grant Delta-Sonic's summary judgment motion) will splinter into thousands of mini-trials on liability and damages because, as a matter of due process, Delta-Sonic would be entitled to offer evidence (testimony and documents), on an ***employee-by-employee*** basis, and a ***week-by-week*** basis, that it paid all sums due over a six-year period.  As in *Dukes v. Wal-Mart Stores, Inc.*, 131 S. Ct. 2541 (2011), there is no way to do that in one fell swoop.  This case would become the very definition of unmanageable.

Third, this is a fail-safe class—Plaintiffs define the class contingent on a finding of liability.  If the Court finds that the law did not require Delta-Sonic to issue paystubs that, on

their face, subtract the tipped rate from the minimum wage, no one other than Plaintiffs will be bound because no one will be in the class.  For that reason, fail-safe classes are not proper.

## BACKGROUND

Delta-Sonic operates 19 car wash facilities in western New York, including in Buffalo, Syracuse, and Rochester.  At each facility, Delta-Sonic employs "Delta Techs," who are generally young men and women (often in high school or college) who cover various job positions ranging from power-washing customers' vehicles, programming the car wash computer controls, hand-drying the vehicles, and detailing the interior of vehicles.  [Dkt. 48-1, Defs.' Statement of Facts in Support of Mot. for Summ. J. (filed July 14, 2015, "SOF") ¶ 2.] Most employees start as a Delta Tech, and rotate among the various positions during a work day.  [*Id.*]  Delta Techs are generally paid minimum wage at first, and thereafter receive raises based on their performance and hours worked.  [*Id.*]

While performing certain jobs, Delta Techs customarily receive cash tips from customers.  [SOF ¶ 3.]  A Delta Tech keeps all tips he or she receives.  [SOF ¶¶ 22, 24.]  Delta-Sonic pays a "tipped" rate for hours spent in those jobs, which was below minimum wage, as permitted by state and federal law.[1]  [SOF ¶ 22.]  These "tipped" jobs are highly sought after, even for employees who have been at Delta-Sonic for a while and are earning over $10/hour in other jobs, because they can make more money in tipped positions.

### A.   Plaintiffs earned the minimum wage, and often more, throughout their employment.

Taylor and Cashman worked from time to time as Delta Techs, and earned as much as $80 in tips during a six-hour shift, depending on the volume of business.  [Ex. 1, Deposition of Essence Taylor ("Taylor Dep.") 29:3-9.]  If, however, Taylor and Cashman (or any Delta Tech) did not make enough in tips while in a "tipped" position to earn at least the minimum wage, Delta-Sonic guaranteed, and paid them, enough to get them to minimum wage.  [Dkt. 48-1, SOF ¶ 22.]  That was rarely necessary:  during his one year at Delta-Sonic, Cashman received

---

[1] For example, in 2014, the New York minimum wage was $8/hour, and Delta-Sonic's "tipped" rate was $6.05/hour.

8541632

guarantee pay in only one week, $1.61 total (Ex. 2, Deposition of Daniel Cashman ("Cashman Dep.") 22:25-23:25); Taylor received guarantee pay only 23 times during her six years at Delta-Sonic, totaling $107.72 total.  [Dkt. 48-3, Declaration of Brian Evers ("Evers Decl.) ¶ 12; *id.*, Ex. F to Evers Decl. (Dkts. 48-5 to 48-10).]  In other words, when counting the tips they received, Cashman and Taylor almost always made at or *more* than minimum wage.

Delta-Sonic issued Cashman and Taylor detailed paystubs each week.  [*Id.*]  The paystubs list the hours each worked, all their hourly rates of pay (minimum wage and tipped rate) that particular week, tips reported, gross earnings, and taxes withheld.  [*Id.*]

**B.      Plaintiffs seek certification on only one of their claims.**

On December 15, 2014, Cashman and Taylor filed a Class and Collective Action Complaint against Delta-Sonic.  [Dkt. 1.]  They allege three claims:  (i) violation of NYLL's Minimum Wage Act (§ 652), and 12 NYCRR § 142-2.5(b), the Miscellaneous Wage Order for failing to record the tip credit on each of their paystubs, back to December 15, 2008 ("Paystub Notice Claim"); (ii) violation of the federal Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.*, and (iii) violation of the NYLL and 12 NYCRR § 142-2.5(c), which governs the uniform maintenance allowance.  [Dkt. 1 ¶¶ 88-112.]

On June 1, 2015, just as discovery was underway,[2] Plaintiffs moved for class certification on their Paystub Notice Claim.  [Dkts. 35, 35-1.]  Their motion says nothing about their FLSA or uniform maintenance claim.

Plaintiffs propose the following class definition on their Paystub Notice Claim:

> All tipped employees who worked for Delta Sonic at its New York locations from December 2008 to the present that did not receive a wage record, with each paycheck, that included the tip allowance claimed by Delta Sonic as a separate line item as required by 12 N.Y.C.R.R. § 142-2.5(b)(1).

[Dkt. 35-1 at 2.]  Plaintiffs submitted copies of Taylor and Cashman's paystubs with their motion.  Other than their counsel's affidavit regarding their experience with wage and hour class actions, Plaintiffs offered no other evidence to support class certification.

---

[2] Discovery closes on September 4, 2015.  [Dkt. 25.]

8541632

**ARGUMENT**

Class actions are an exception to the general rule that litigation must remain between the named parties only. *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013). To come within the exception, Plaintiffs must "***affirmatively*** demonstrate" their compliance with Rule 23 by a preponderance of the evidence. *Id.* (emphasis added); *see also Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008) (preponderance of evidence standard requires court to "receive enough evidence, by affidavits, documents, or testimony, to be satisfied that each Rule 23 requirement has been met").

Plaintiffs' motion must be denied unless they prove *all* of the following:

1.    The class is so numerous that joinder of all members is impracticable (numerosity)[3];

2.    There are questions of law or fact common to the class (commonality);

3.    The claims or defenses of the representative parties are typical of the claims or defenses of the class (typicality); and

4.    The representative parties will fairly and adequately protect the interests of the class (adequacy).

Fed. R. Civ. P. 23(a).

In addition to their burden under Rule 23(a), Plaintiffs must prove that class treatment is suitable under at least one subsection of Rule 23(b):

(1) prosecuting separate actions by or against individual class members would create a risk of: (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; …[4]

(2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive

---

[3] Delta-Sonic does not dispute that the numerosity requirement is satisfied.

[4] Subpart B to (b)(1) involves "limited fund classes," which Plaintiffs do not allege. *See* Fed. R. Civ. P. 23(b)(1)(B) ("adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests").

8541632

> relief … is appropriate respecting the class as a whole; or
>
> (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

Fed. R. Civ. P. 23(b).  "Rule 23 does not set forth a mere pleading standard.  Rather . . . the party must also satisfy ***through evidentiary proof*** at least one of the provisions of Rule 23(b)."  *Shady Grove Orthopedic Assocs. PA v. Allstate Ins. Co.*, 293 F.R.D. 287, 298 (E.D.N.Y. 2013) (emphasis added).  Plaintiffs cannot satisfy all of the requirements under Rule 23(a) and cannot meet any of the requirements under Rule 23(b).

## I.      Plaintiffs have no standing to represent a putative class on their Paystub Notice Claim because the remedy they seek does not exist.

Because Delta-Sonic is entitled to summary judgment on the Paystub Notice Claim, *see* Dkt. 48 & 48-14 (Defs.' Mot. for Summ. J. (Notice & Memorandum), filed July 14, 2015), there is no reason for this Court to decide Plaintiffs' class certification motion.  Delta-Sonic's Motion raises a dispositive issue of law—whether NYLL and the Miscellaneous Wage Order (or any Wage Order for that matter) have ever authorized stripping an employer of the tip credit it had taken for many years simply because it did not subtract the tipped rate from the minimum wage on each paystub.  Resolving that issue without delving into thorny class certification issues "protect[s] both the parties and the court from needless and costly further litigation." *Christensen v. Kiewit-Murdock Inv. Corp.*, 815 F.2d 206, 214 (2d Cir. 1987) (quotations omitted) (deciding summary judgment motion before class certification motion).

"[T]he determination of whether a class action meets the requirements of Rule 23 must be performed separately from the determination of the merits, but it does not require that the class certification be addressed first.  There's nothing in Rule 23 which precludes the court from examining the merits of plaintiff's claims on a proper … Rule 56 motion for summary judgment simply because such a motion precedes resolution of the issue of class certification." *Schweizer v. Trans Union Corp.*, 136 F.3d 233, 239 (2d Cir. 1998) (quotations omitted).  Thus, in *In re Starbucks Employee Gratuity Litig.*, 264 F.R.D. 67 (S.D.N.Y. 2009), the district court granted summary judgment on all but one of plaintiffs' claims, precluding a determination of a class

8541632

certification motion on those claims.  *Id.* at 75 ("A district court may reserve decision on a class certification motion pending … disposition of a motion for summary judgment").

As explained in detail in Delta-Sonic's Motion for Summary Judgment [Dkt. 48], Plaintiffs cannot sue for (lawful) tip credit amounts taken by Delta-Sonic just because it allegedly failed to itemize the tip credit on a paystub.  Without any claim, Plaintiffs' class certification motion should be denied.  *See Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 156 (1982) (cannot certify a class where representatives lack standing to sue).

## II.     Plaintiffs cannot satisfy the strict requirements of Rule 23 by relying on bare legal assertions.

### A.     Taylor and Cashman cannot adequately represent the class.

Courts must carefully scrutinize the adequacy of the proposed class representatives under Rule 23(a).  *Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 95 (S.D.N.Y. 2010) (citing *Eisen v. Carlisle & Jacquelin*, 391 F.2d 555, 562 (2d Cir. 1968)).  Class representatives must understand their responsibilities.  *E.g.*, *Darvin v. Int'l Harvester Co.*, 610 F. Supp. 255, 257 (S.D.N.Y. 1985) (plaintiff was inadequate class representative, in part, because he was "unsure of who he purported to represent should the suit be certified as a class action"); *Moskowitz v. La Suisse, Societe D'Assurances sur la Vie*, 282 F.R.D. 54, 73-74 (S.D.N.Y. 2012) (proposed class representatives inadequate because they did not understand their responsibilities and lacked knowledge about litigation).  Being a diligent class representative matters.  *Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1077-78 (2d Cir. 1995) ("Once the action has been certified to proceed as a class action, it is incumbent on the class representatives to be alert for, and to report to the court, any conflict of interest on the part of class counsel, as for example, counsel's greater concern for receiving a fee than for pursuing the class claims." (quotations omitted)).  A representative's duties cannot be taken lightly.  *Taylor v. Sturgell*, 553 U.S. 880, 881 (2008) ("Extending the preclusive effect of a judgment to a nonparty runs up against the 'deep-rooted historic tradition that everyone should have his own day in court." (quotations omitted)).

Taylor and Cashman are not suitable class representatives.  For starters, neither submitted an affidavit of any sort explaining to this Court that they are willing and able to perform their

8541632

duties as a class representative.  There is nothing in the motion about their backgrounds or their understanding of the time commitment.

And Taylor lacks an understanding about her role as a class representative.  She testified that her *only* duty as a class representative was "[t]o speak on behalf of those individuals." [Ex. 1, Taylor Dep. 44:9-11.]  But she never talked to any other Delta Techs about the case except to say it existed, even though she regularly talked with employees or former employees, even just a week before her deposition.  [*Id*. at 43:4-24.]

Moreover, Taylor's integrity will no doubt be an issue in this case.  Class representatives are fiduciaries of the class and "must adhere to the highest standards of honesty and integrity." *Weisman v. Darneille*, 78 F.R.D. 669, 671 (S.D.N.Y. 1978); *Jackson v. Bloomberg, L.P.*, 298 F.R.D. 152, 165 (S.D.N.Y. 2014) ("Plaintiff's credibility is relevant in determining whether she can adequately represent the class."); *see also Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 549 (1949) (class members' interests are dependent upon class representatives' "diligence, wisdom and integrity.").

Taylor admitted to underreporting the tips she earned while at Delta-Sonic.  [Ex. 1, Taylor Dep. 31:13-41:13.]  She explained that she would claim $2 an hour in tips *even if she made six times that amount*.  [*Id.* at 29:3-4, 39:5-8 (stating that she would receive up to $80 in tips in six hours but would only claim $12 total).]

Regarding what happened when she made less than $2 an hour in tips, Taylor contradicted herself.  First, she claimed that she reported $2 an hour, no matter what, because supposedly that is what she was told to do.  [*Id.* at 36:19-20 ("If I made zero dollars in tips and I was down there for two hours, I would claim $4.").]  Then, when pressed as to who actually told her to do that, she backtracked and admitted that was not the case.  In fact, if she made less than $2 an hour in tips, she would claim the actual amount of tips that she made.  [*Id.* at 37:6-8, 38:14-25.]  But not when she made *more*—she pocketed the extra and did not report it, even though Taylor knew how to record her tips and understood that her tips were taxable income. [*Id.* at 39:2-40:24.]

Taylor also admitted that she had cash register shortages *five* times during her employment.  [*Id.* at 16:17-17:3.]  Two resulted in written discipline, including one that involved

8541632

multiple counting errors totaling $175.  [Ex. 3 hereto, Second Declaration of Brian Evers Decl. ("2d Evers Decl.") ¶ 2; Ex. 1, Taylor Dep. 12:14-15:14.]

Finally, Taylor lacks the memory required to represent a class adequately.  *See, e.g.*, *Darvin*, 610 F. Supp. at 257 (denying certification where plaintiff's deposition "demonstrates that his personal knowledge of the facts pleaded in the complaint is extremely limited or nonexistent"; his "uncertainty and inconsistency . . . illustrate his inadequacy to act as class representative"); *Weinstein v. Am. Biomaterials Corp.*, 123 F.R.D. 442, 466 (S.D.N.Y. 1988) (lack of memory renders proposed class representative inadequate).  Taylor cannot remember what anyone said to her about pay during her new hire interview or orientation (and a lot was said, *see* Dkt. 48-1, SOF ¶¶ 22), even though one of her claims (under the FLSA) hinges on that *pre*-employment notice.  [Ex. 1, Taylor Dep. 61:16-66:6.]  She claimed she could recall only 1 of her 13 disciplinary notices at Delta-Sonic.  [Ex. 3 hereto, 2d Evers Decl. ¶ 2; Ex. 1, Taylor Dep. 11:6-12.]

With Taylor disqualified, Cashman's short tenure at Delta-Sonic makes him especially inadequate to represent the entire class on his own.  Indeed, he had no idea that he may represent (and thus bind them forever with a final judgment) thousands of individuals who live outside New York (Ex. 2, Cashman Dep. 31:12-15), or that other potential class members had opted into the case (*id.* at 9:5-7).  *See Spagnola*, 264 F.R.D. at 95 (class representatives must have "adequate knowledge of the case and [be] actively involved"); *Simon v. Ashworth*, 2007 WL 4811932, at *2-3 (C.D. Cal.) (class representative inadequate where he did not supervise case; he "cannot possibly represent the interests of the class if he is unaware of his obligations to the class").  He also admitted that he paid little attention to his paycheck while at Delta-Sonic.  [Ex. 2, Cashman Dep. 69:9-18 ("I can't tell you.  I never focused too much on it.").]  Plaintiffs have not proven, and cannot prove, adequacy by a preponderance of the evidence.

### B.    Plaintiffs cannot satisfy any of the requirements of Rule 23(b).

#### 1.    There is no basis for (b)(1) certification.

In their class certification motion, Plaintiffs gloss over the requirements for (b)(1) certification as if that is sufficient.  [Dkt. 35-1 at 8.]  It is not.  *See Jean v. Krauss*, 2015 WL 430116, at *2 (W.D.N.Y.) (issue waiver applies where attorney "cites no cases to support his

position, presents no factual recitations, and does not even attempt to present a developed argument"; "[r]ather, he simply states, in a perfunctory fashion, that his client is entitled to relief (quotations omitted)); *N.K. v. New York City Dep't of Educ.*, 961 F.Supp.2d 577, 587 (S.D.N.Y. 2013) (same); *see also Tolbert v. Queens College*, 242 F.3d 58, 75 (2d Cir. 2001) (same).

Rule 23(b)(1) certification is extremely rare, *Patton v. Topps Meat Co., LLC*, 2010 WL 9432381, *6 (W.D.N.Y.), in part because there is no ability for class members to opt out and pursue their individual claims separately, *In re Telectronics Pacing Sys., Inc.*, 221 F.3d 870, 877 (6th Cir. 2000) ("mandatory class treatment is to be confined to a narrow category of cases").

The only argument on (b)(1) certification Plaintiffs do make in passing is a non-issue. They argue that separate adjudications of individual claims would actually benefit them, not Delta-Sonic, because if Plaintiffs win on their individual claim, *res judicata* would bar Delta-Sonic from raising its defenses in future litigation against other former employees.  [Dkt. 35-1 at 8.]  But whether or not res judicata applies—and against which parties—is not reason enough to certify a class on a claim that is otherwise unsuitable for class treatment.  In any event, before proceeding under Rule 23(b)(1), a putative class representative must prove that the defendant cannot comply with one judgment without violating another.  *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013) ("The party must also satisfy through evidentiary proof at least one of the provisions of Rule 23(b)." (quotations omitted)); *see also McBirney v. Autry*, 106 F.R.D. 240, 245 (N.D. Tex. 1985) ("Rule 23(b)(1)(A) is satisfied only in the event … [of an] inescapable legal quagmire of not being able to comply with one judgment without violating the terms of another." (quotations omitted)).  Plaintiffs' have offered no such evidence.

### 2.      Taylor and Cashman cannot seek injunctive relief under (b)(2).

Rule 23(b)(2) certification is available only to those with standing to seek injunctive relief.  *E.g.*, *Dukes*, 131 S. Ct. at 2545; *see also Chen-Oster v. Goldman, Sachs & Co.*, 877 F. Supp. 2d 113, 122 (S.D.N.Y. 2012).  *Former* employees like Taylor and Cashman do not have standing to seek injunctive relief against a former employer.  *See Dukes*, 131 S. Ct. at 2545 (to justify a departure from the general rule that litigation is to be conducted by and on behalf of named parties only, "class representative must be part of the class and possess the same interest and suffer the same injury as the class members" (quotations omitted)); *Kassman v. KPMG LLP*,

8541632

925 F. Supp.2d 453, 465-66 (S.D.N.Y. 2013) ("[P]laintiff generally lacks standing to seek injunctive or declaratory relief against his or her former employer, as there is no prospect that he or she will be injured in the future.").

Likewise, subsection (b)(2) requires that the injunctive relief being sought is "appropriate respecting the class *as a whole*." Fed. R. Civ. P. 23(b)(2) (emphasis added). Courts applying Rule 23(b)(2) in the employment context have held that *former* employees cannot be members of a class that seeks injunctive relief against their former employer. *See, e.g.*, *Chen-Oster*, 877 F. Supp. 2d at 122 (noting that Rule 23(b)(2) certification improper where "about half the members of the class" were former employees who had no claim for injunctive relief (citing *Dukes*, 131 S. Ct. at 2545)).

In any event, any injunctive relief in this case is just an afterthought to the substantial amount of damages Plaintiffs seek. *See, e.g.*, *Daniel v. Am. Bd. of Emergency Med.*, 269 F. Supp.2d 159, (W.D.N.Y. 2003) (class certification under (b)(2) inappropriate "where the relief requested relates predominantly to money damages" (citing *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 145 (2d Cir. 2001))). Indeed, it appears equitable relief is moot: their own counsel boasts that Delta-Sonic's paystubs now comply with the Wage Order (according to their flawed reading of the regulations) as a result of this lawsuit. [Dkt. 36 at 2.] Certification under Rule 23(b)(2) is inappropriate.

### 3. The proposed class is not suitable under (b)(3) because commonality is lacking and individual issues will predominate.

Rule 23(b)(3) certification of Taylor and Cashman's Paystub Notice Claim is not available unless the "questions of law or fact common to class members *predominate* over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3) (emphasis added). To establish commonality in the first instance, "the harm allegedly suffered by the named plaintiffs [must be] the same harm suffered by each class member." *Schear v. Food Scope Am., Inc.*, 297 F.R.D. 114, 124 (S.D.N.Y. 2014). And the alleged common issues of fact must be "capable of classwide resolution" such that their "truth or falsity will resolve [the] issue . . . in *one stroke*." *Id.* (emphasis added), *citing Dukes*, 131 S. Ct. at 2545.

For at least three reasons, the Paystub Notice Claim cannot be resolved "in one stroke":

- 11 -

First, the alleged *harm* (i.e., liability, not just damages) differs from one class member to the next. This is not a case involving servers at a restaurant (who are subject to a different Wage Order than the potential class members here), where the putative class members almost always worked in a "tipped" position and earned a sub-minimum wage rate. That was the case in *Hicks v. T.L. Cannon Corp.*, 35 F. Supp.3d 329 (W.D.N.Y 2014),[5] on which Plaintiffs base their class certification motion. Here, though, many Delta-Sonic employees worked in more than one position in a given week (sometimes in three or four), earning a tipped rate for some of their hours in a week and higher-than-minimum-wage rates for the rest of the week; other employees (like Taylor) worked a lot of hours in a *non*-tipped position, making more than minimum wage every hour without any tip or tip credit. [Dkt. 48-1, Defs.' SOF, Evers Decl. ¶¶ 12; *id.*, Ex. F (Dkts. 48-5 to 48-10).] Others received guarantee pay because they did not make enough in tips in a given week; others did not. [*Id.*] Some employees, like Taylor, earned commissions. [*Id.*; Ex. 1, Taylor Dep. 70:4-10.] All of that varies week to week. And there are over 300 weeks in the proposed class period, during which pay rates changed numerous times.

Thus, no one paystub is representative or typical in this case. *See* Fed. R. Civ. P. 23(a)(3) (claims of class representative must be "typical" of the class). **Each** paystub for **each** employee in the proposed class, for *each* week he or she worked, will have to be analyzed to decide whether there is any minimum wage liability. *See, e.g.*, *Dauphin v. Chestnut Ridge Transp. Inc.*, 2009 WL 2596636, at *3 (S.D.N.Y.) (claim under NYLL for unpaid overtime; bus drivers' individual travel records predominate over generalized proof). As explained in Delta-Sonic's Motion for Summary Judgment, "minimum wage claims are based on the plaintiff's pay for a particular week." *Hart v. Crab Addison, Inc.*, 2014 WL 2865899, at *11 (W.D.N.Y.) ("the workweek is the applicable time period for calculating the minimum wage"); *see Caci v. Wiz of Lake Grove*, 267 F. Supp.2d 297, 301 (E.D.N.Y. 2003) (no minimum wage violation where employee's "weekly pay divided by the total hours he worked … yielded an hourly rate

---

[5] *Hicks* is not binding on this Court. *See U.S. v. Birney*, 686 F.2d 102, 107 (2d Cir. 1982) ("[J]udges of coordinate jurisdiction are not bound by each other's rulings, but are free to disregard them if they so choose."); *In re Carrozzella & Richardson*, 255 B.R. 267, 272 (D. Conn. 2000) ("It is widely accepted that the decision of one district court judge is not binding on another district judge, even within the same district.").

8541632

exceeding the required minimum wage" (citing *U.S. v. Klinghoffer Bros. Realty*, 285 F.2d 487 (2d Cir. 1961))).

Moreover, in *Hicks*, Judge Wolford found that the "simplicity" of the math required to calculate the tip credit was crucial in determining liability on a paystub notice claim. *Id*. at 344 (denying summary judgment to both parties; "[n]or is it obvious from the face of the pay statements provided to this Court what 'simple math' … plaintiffs should have performed"). Delta-Sonic contends that *Hicks* was wrongly decided and that no "forfeiture-of-tip-credit" remedy exists for paystub violations. However, even under *Hicks*' reasoning, answering that "simple math" question cannot be done in "one stroke." The information on class members' paystubs varies each and every week, and not surprisingly, the knowledge and sophistication of individual class member varies widely. For instance, Cashman refused to do any math, no matter how simple. [Ex. 2, Cashman Dep. 28:20-29:3.] Taylor, on the other hand, was able to handle rather difficult math in explaining the shortage in her cash drawer on one occasion. [Ex. 1, Taylor Dep. 88:14-89:9.]

Whether a particular employee was sufficiently apprised of relevant pay information depends on his or her circumstances, and Delta-Sonic is entitled to adjudicate such notice issues on an individual-by-individual basis. *See, e.g.*, *Bryan v. Amrep Corp.*, 429 F. Supp. 313, 317 (S.D.N.Y. 1977) (because "proof of plaintiff's actual knowledge of the claimed misstatements or omissions" is an affirmative defense, "[k]nowledge of additional facts, at earlier times, by different members of the class may create individual issues"). That's a lot of trials, and there is nothing in Plaintiffs' motion which explains why or how class treatment would be more efficient than individual adjudications. *Shayler v. Midtown Investigations Ltd.*, 2013 WL 772818, at *5, 9-10 (S.D.N.Y.) (class motion denied because plaintiffs "have proffered only boilerplate assertions as to why class treatment would be superior); *see also Cuevas v. Citizens Fin. Grp. Inc.*, 526 Fed. Appx. 19, *21-22 (2d Cir. 2013) (court must conduct a "rigorous analysis" to determine compliance with Rule 23). There is just a generic assertion that "class members would be discouraged from vindicating their rights." [Dkt. 35-1 at 9.] That is not enough.

Second, even if the Courts could adjudicate a notice requirement in one trial for thousands of individual class members, there is no liability under the WTPA for paystub notices *unless and until* the employer's affirmative defense is adjudicated.  Section 195(3) of the WTPA provides that an employer shall:

> furnish each employee with a *statement* with every *payment of wages*, listing the following: … rate or rates of pay and basis thereof; whether paid by the hour, shift, day, week, salary, piece, commission, or other; gross wages; deductions; *allowances, if any, claimed as part of the minimum wage*; and net wages.

(Emphasis added.)  With the WTPA, the Legislature included—*for the first time*[6]—statutory damages as an enforcement mechanism.  NYLL § 198(1-d) provides that if any employee is not provided a statement as required by § 195(3), he or she "shall recover in a civil action damages of two hundred fifty dollars for each work day that the violations occurred or continue to occur, but not to exceed a total of five thousand dollars, together with costs and reasonable attorneys' fees."

But the Legislature specified that those capped damages are **_unavailable_** if there was no prejudice to the employee.  Section 198(1-d) goes on to say that say that statutory damages are recoverable *only if* the employee was actually underpaid, i.e., there is no recovery "if the employer made complete and timely payment of all wages due … the employee who was not provided statements as required by [195(3)]."  NYLL § 198(1-d).  In other words, it is a complete defense—there is no liability at all if the employer satisfies § 198(1-d).  A paystub notice violation alone cannot result (and has never resulted) in an underpayment of wages.

Plaintiffs will claim that the WTPA's affirmative defense is not available to Delta-Sonic because it did not pay the minimum wage (which, in fact, it did); that is, Plaintiffs create the fiction that Delta-Sonic paid below minimum wage because it must be (retroactively)

---

[6] Pre-WTPA, there was no remedy for what Plaintiffs allege in their Paystub Notice Claim.  *Chen v. Chan*, 2015 WL 4032693, at *3 (2d Cir.) ("[C]ourts have held that, prior to a series of amendments in 2011, New York's regulations required no such notice as a prerequisite to claiming a tip allowance.").

8541632

stripped of the tip credit for its failure to subtract the tipped rate from the minimum wage on each paystub. But if that were true, employers which issued paystubs without doing this simple math—and there are thousands of such employers in New York—could never avail themselves of the WTPA's affirmative defense, contrary to the Legislature's intent: the WTPA says that in "*any action*" for a violation of the paystub requirements, the employer can avoid statutory damages altogether by showing it paid all sums due. *See In re Malta Town Centre I, Ltd.*, 3 N.Y.3d 563, 567 (2004) ("[W]e turn first to the plain language of the statutes as the best evidence of legislative intent"). And that is a question of liability, not the amount of damages. If Plaintiffs want to sue over paystub notices, they have to proceed under the WTPA. But they don't want to do that.[7]

The Second Circuit has recognized that statutory affirmative defenses involve predominant issues of fact that preclude class certification. *Myers v. Hertz Corp.*, 624 F.3d 537 (2d Cir. 2010). In *Myers*, a station manager for a rental car company filed a class action complaint against Hertz, alleging failure to pay overtime under the FLSA and failure to timely pay wages under NYLL § 191. *Id*. at 542-43. Hertz raised a statutory affirmative defense under FLSA § 13(a)(1), alleging that its station managers were exempt from FLSA overtime guarantees. *Id*. at 542. Plaintiff sought certification on the § 191 claim, which was factually and legally intertwined with the overtime claim. *See id*. at 542, 544-45. The district court denied the motion because the main issue it had to decide—whether each potential plaintiff was properly classified as exempt—"required ... fact intensive inquiry." *Id*. at 545 (quotations omitted).

The Second Circuit affirmed: "The 'conceded' issues in this case … are clearly less substantial in the overall mix of issues this case presents when compared to the ultimate (contested) question the district court would have to decide in any potential class action – whether plaintiffs were legally entitled to the overtime they were not paid." *Id*. at 550-51. The

---

[7] They instead want to rely on the Miscellaneous Wage Order, 12 NYCRR § 142-2.5(b), but as explained in Delta-Sonic's Motion for Summary Judgment, the plain language of the Wage Order does not condition the tip credit on any particular paystub notice. In any event, if an agency regulation is "out of harmony" with an applicable statute, the statute *must* prevail. *See, e.g., Weiss v. City of N.Y.*, 95 N.Y.2d 1, 5 (Ct. App. 2000).

8541632

court went on to reason, "it does not matter that the exemption … may technically be termed an 'affirmative defense.'  The 'defense' is in reality the 'mirror image' of plaintiffs' claim." *Id.* (citing Alan Erbsen, *From "Predominance" to "Resolvability": A New Approach to Regulating Class Actions*, 58 Vand. L. Rev. 995, 1075 (2005) ("[M]ost 'defenses' are merely the mirror image of arguments necessary to prove *liability*." (emphasis added)).

If Plaintiffs have a claim (they don't), the NYLL and its affirmative defense applies and establishes the predominant issues of fact on **liability**.  *See Myers v. Hertz Corp.*, 2007 WL 2126264, at *6-7 (E.D.N.Y.) ("Because predominance is similar, but more demanding test than commonality, plaintiffs fail to satisfy it for the same reasons they fail to satisfy commonality; the main issue in this case . . . is not subject to generalized proof." (alterations & quotations omitted)).  If the Court certifies the class as proposed, Delta-Sonic will be deprived of its right to defend itself.  *See Dukes*, 131 S. Ct. at 2561 (employer has "the right to raise any individual affirmative defenses it may have," and offer individualized proof in support; "Rules Enabling Act forbids interpreting Rule 23 to abridge, enlarge or modify any substantive right").

<u>Third</u>, (b)(3) certification is improper because Plaintiffs have failed even to offer, let alone explain, the basis for calculating damages for thousands of putative class members in this case.  *Comcast*, 133 S. Ct. at 1433 (damages questions must be considered at the class certification stage when weighing predominance under Rule 23(b)(3); *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 408 (2d Cir. 2015) (same.)  Their motion does not even mention damages. *See Myers*, 624 F.3d at 547 (plaintiff has burden to establish all of Rule 23's requirements). Without an opportunity to consider whether the damages that Plaintiffs seek will create myriad individual issues not capable of efficient resolution, this Court cannot grant certification.

## III.    Plaintiffs propose an impermissible fail-safe class.

Finally, the class definition is improper.  A class definition must be neutral enough to make both sides susceptible to an adverse judgment.  *Spread Enters., Inc. v. First Data Merch. Servs.*, 298 F.R.D. 54, 69-70 (E.D.N.Y. 2014) (rejecting proposed class definitions because they presupposed the outcome of material issue in case).  "A fail-safe class is one whose definition shields the putative class members from receiving an adverse judgment."  *Mazzei v. Money Store*, 288 F.R.D. 45, 55 (S.D.N.Y. 2012) (quotations omitted).  In other words, "either the class

members win or, by virtue of losing, they are not in the class, and therefore not bound by the judgment." *Spread Enters.*, 298 F.R.D. at 69.  Courts should not certify fail-safe classes because "it is unfair to defendants, it prevents an adverse judgment being entered against plaintiffs, and it is unmanageable because the members of the class could only be known *after* a determination of liability." *Mazzei*, 288 F.R.D. at 55 (emphasis added).

Plaintiffs' Paystub Notice Claim seeks to enforce their alleged rights under 12 N.Y.C.R.R. § 142-2.5(b)(1)(iii), which provides:

> Tips, or gratuities, may be considered a part of the minimum wage subject to the following conditions: . . . the allowance claimed by the employer is recorded on a weekly basis as a separate item in the wage record.

By comparison, Plaintiffs' proposed class definition in this case encompasses tipped Delta-Sonic employees "who [sic] did not receive a wage record, with each paycheck, that included the tip allowance claimed by Delta-Sonic as a separate line item *as required by* 12 N.Y.C.R.R. § 142-2.5(b)(1)." [Dkt. 35-1 at 2 (emphasis added).]  The proposed class definition mirrors the controlling regulation; indeed, it incorporates its very requirements.   Thus, membership in a class cannot be ascertained without determining whether there was a violation of § 142-2.5(b)(1)(iii).   In other words, there must be a final determination on liability before determining whether there is a class.   That puts the cart before the horse in violation of Rule 23. Plaintiffs' fail-safe class cannot be certified.

## CONCLUSION

This Court should deny Plaintiffs' motion for class certification on their Paystub Notice Claim under NYCRR § 142-2.5(b).

DATED this 14th day of July, 2015.

STEPTOE & JOHNSON LLP

By  s/ Douglas D. Janicik
    Steven D. Wheeless
    Lawrence Allen Katz
    Douglas D. Janicik
    Erin Norris Bass

8541632

*All Admitted Pro Hac Vice*
201 E. Washington St., Suite 1600
Phoenix, AZ 85004
(602) 257-5211
djanicik@steptoe.com

BOND SCHOENECK & KING

Sharon Porcellio
Key Center
40 Fountain Plaza, Suite 600
Buffalo, NY 14202-2200


Attorneys for Defendants

8541632

## CERTIFICATE OF SERVICE

I hereby certify that on July 14, 2015, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Justin M. Cordello
CORDELLO LAW PLLC
693 East Avenue
Suite 220
Rochester, NY 14607
(585) 857-9684
justin@cordellolaw.com

Robert L. Mullin
FERR & MULLIN
7635 Main Street Fishers
P.O. Box 440
Fishers, NY 14453
(585) 869-0210
rlmullin@ferrmullinlaw.com

Attorneys for Plaintiffs

Jackie Lynn Bell
Jackie Lynn Bell

8541632

# EXHIBIT 1

1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

ESSENCE TAYLOR and DANIEL CASHMAN, on behalf of
themselves and all other employees similarly
situated,

       Plaintiffs,

       Civil Action No. 6:14-cv-06698-MAT

v.

BENDERSON PROPERTIES, INC., DELTA-SONIC CAR WASH
SYSTEMS, INC., and RONALD BENDERSON,

       Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

Deposition Upon Oral Examination Of:
       Essence C. Taylor

Location:      Cordello Law PLLC
          693 East Avenue, Suite 220
          Rochester, New York 14607

Date:         June 29, 2015

Time:         3:30 p.m.

Reported By:  Maria A. Wolczyk, CRR, RPR, CSR

A P P E A R A N C E S

Appearing on Behalf of Plaintiffs:

Justin M. Cordello, Esq.

    Cordello Law PLLC

    693 East Avenue, Suite 220

    Rochester, New York  14607


Robert L. Mullin, Esq.

    Ferr & Mullin, P.C.

    7635 Main Street

    Fishers, New York  14453



Appearing on Behalf of Defendants:

Erin Norris Bass, Esq.

Doug Janicik, Esq.

    Steptoe & Johnson, LLP

    201 East Washington Street, Suite 1600

    Phoenix, Arizona  85004-2382



Also Present:

Paul Lutz, Delta-Sonic Car Wash Systems, Inc.


*     *     *

1          ESSENCE C. TAYLOR - BY MS. BASS

2      A.  No.

3      Q.  While working at Delta-Sonic, were you

4  ever disciplined?

5      A.  Yes.

6      Q.  What were you disciplined for?

7      A.  Texting.  That was about it.

8      Q.  Just texting?

9      A.  Yeah.  Having my phone when I wasn't

10  supposed to.

11      Q.  No other disciplines?

12      A.  No.

13          (The following exhibit was marked for

14          identification:  Defendants EXH 8.)

15      Q.  The court reporter has just put in front

16  of you a document marked Defendants Exhibit 8.  Would

17  you take a moment to look at that, please?

18      A.  Okay.

19          MR. CORDELLO:  Take all the time you need,

20  Essence.

21          THE WITNESS:  Okay.

22          MS. BASS:  Just let me know when you're

23  ready.

24          (There was a pause in the proceeding.)

25          THE WITNESS:  Okay.  I have a question.

1              ESSENCE C. TAYLOR - BY MS. BASS

2    I can barely read his handwriting.

3              MR. CORDELLO:   Is there another?

4              MS. BASS:   This is the only copy of this

5    I have.

6              MR. CORDELLO:   The only copy?

7         Q.   We'll do our best.   I'll help you.   Maybe

8    we can decipher it together.

9              Do you need more time?

10        A.   I'm ready.

11        Q.   Do you recognize this document?

12        A.   Yes.

13        Q.   What is this?

14        A.   It says, "Employee Disciplinary Report."

15        Q.   And is that your name at the top there?

16        A.   Yes.

17        Q.   And do you remember receiving this

18   disciplinary report?

19        A.   I don't.

20        Q.   If you go down towards the bottom, it

21   says, "Signature of Employee."   Is that your

22   signature?

23        A.   Yes.

24        Q.   And the date is July 17th, 2008?

25        A.   Yes.

1              ESSENCE C. TAYLOR - BY MS. BASS

2         Q.   And looking at this, you have no

3    independent recollection of receiving this?

4         A.   No.

5         Q.   You'll see about in the middle, "What

6    specific actions led to the policy violation."  If I'm

7    reading this correctly, it says, "The drawer was $175

8    short from shift, $50 under the drawer.  You also did

9    a deposit of 500 in which" -- "$500 in which the

10   actual was $600."

11        A.   Okay.

12        Q.   Do you recall a time when your drawer was

13   short and you received a written warning?

14        A.   Yes.

15        Q.   Tell me about that.

16        A.   Well, as stated here, it said that $50 was

17   underneath the drawer.

18        Q.   What does that mean, "underneath the

19   drawer"?

20        A.   I recall when -- times when at the end of

21   shift we would have to take our drawer out when making

22   deposits for the end of the night, and sometime money

23   would get behind there and be underneath there.

24   That's why they told us to check after times like

25   this.

```
 1              ESSENCE C. TAYLOR - BY MS. BASS
 2         Q.  So the money would get like shoved behind
 3    the drawer?
 4         A.  Yes.  Especially like on busy days when we
 5    have customers constantly coming in and we really
 6    didn't have time to make deposits; instances like
 7    that.
 8         Q.  So on busy days when you didn't have time
 9    to make deposits, money would get shoved behind the
10    drawer?
11         A.  If there was too much money in the drawer.
12         Q.  Okay.  And then it says that, "The drawer
13    was $175 short."  Do you recall the drawer being $175
14    short?
15         A.  No, I don't.
16         Q.  Or why that would have happened?
17         A.  No.
18         Q.  It says that, "You did a deposit of $500
19    in which there was actually $600."  Do you recall
20    that?
21         A.  I don't.
22         Q.  What does it mean, that "you did a
23    deposit"?
24         A.  Usually when we did deposits, we would
25    have to wrap the money up and then drop it in the --
```

```
 1                    ESSENCE C. TAYLOR - BY MS. BASS

 2     like a safe.

 3              Q.   So doing a deposit of $500, would you have

 4     to write down how much the deposit was?

 5              A.   Yes.

 6              Q.   Where would you write that?

 7              A.   Right on the slip that we wrap around the

 8     money.

 9              Q.   So if you did a deposit that was $500 in

10     which there actually was 600 --

11              A.   Mm-hmm.

12              Q.   -- you wrapped up $600, wrote 500 on it,

13     and deposited that?  Is that correct?

14              A.   Yes.

15              Q.   But you don't recall that?

16              A.   I don't recall it, no.

17                   MS. BASS:  Would you please mark number 9?

18              (The following exhibit was marked for

19              identification:  Defendants EXH 9.)

20              Q.   The document in front of you is marked

21     Defendants Exhibit 9.  Would you take a moment to look

22     at that, please?

23              A.   Yes.

24              (There was a pause in the proceeding.)

25              A.   Okay.
```

1                ESSENCE C. TAYLOR - BY MS. BASS

2        Q.  Do you recognize this document?

3        A.  No.

4        Q.  Have you ever seen this document before?

5        A.  Well, it looks like my initials are right

6   there (indicating), so in '09 I have, six years ago.

7        Q.  But you don't remember that today, even

8   looking at this?

9        A.  No.

10        Q.  If you go down about halfway, it says,

11   "What specific action led to the policy violation:

12   Shift for July 16th, 2009, was $25 short, no

13   explanation why."

14            Do you recall your register being

15   $25 short?

16        A.  No.

17        Q.  Do you ever recall having a cash register

18   shortage while working at Delta-Sonic?

19        A.  Yes.

20        Q.  Did that happen frequently?

21        A.  No.

22        Q.  About how many times did that happen?

23        A.  My whole career at Delta-Sonic?

24        Q.  Yes.

25        A.  I would say maybe about five times --

```
 1              ESSENCE C. TAYLOR - BY MS. BASS

 2         Q.   Okay.

 3         A.   -- roughly.

 4         Q.   And you don't recall being written up any

 5    of those times?

 6         A.   I do.

 7         Q.   Do you recall this particular instance

 8    when you were written up?

 9         A.   Not exactly the day.

10         Q.   What do you remember?

11         A.   I remember being written up for my drawer

12    being short.

13         Q.   Okay.  Why was your drawer short?

14         A.   I don't know.

15         Q.   At the top there it says "Verbal Warning."

16    I think if you look back at Defendant's Exhibit 8, it

17    would have said "Written Warning."

18              What does it mean to have a verbal

19    warning?

20         A.   A verbal warning was usually a warning

21    spoken to you by the manager.

22         Q.   And what is a written warning?

23         A.   I don't know.  A warning that's written,

24    like the second warning after the verbal warning.

25              (There was a pause in the proceeding.)
```

```
 1                  ESSENCE C. TAYLOR - BY MS. BASS

 2          Q.   Okay.  Give me some examples.

 3          A.   Really busy days, if I worked making tips,

 4   I would say maybe about $80.

 5          Q.   For the whole day?

 6          A.   Yes.

 7          Q.   And about how many hours were you working?

 8          A.   For the day I could work up to about six

 9   hours at the exit.

10          Q.   Okay.  How about on slow days?

11          A.   On slow days tips were minimum.  There

12   have been times when I've made maybe like $3 for the

13   day.

14          Q.   When were the busy days?

15          A.   Mostly in the wintertime.

16          Q.   Like what month to what month would you

17   consider the busy time?

18          A.   Usually when we first start getting snow,

19   so around, like, November to March.

20          Q.   And when were the slow times?

21          A.   Usually about now in the summertime.

22          Q.   What month to what month?

23          A.   From about June through August.

24          Q.   So in the in-between time, let's say

25   September through October, and April through May,
```

```
 1                 ESSENCE C. TAYLOR - BY MS. BASS

 2        A.   About a dollar or two.

 3        Q.   For most cars?

 4        A.   For most cars.  Not everyone tipped.

 5        Q.   At Delta-Sonic did you have to claim how

 6   much you made in tips?

 7        A.   Yes.

 8        Q.   How did you do that?

 9        A.   They had a clipboard with every employee's

10   name, and next to our name we would have to claim how

11   much we made that day.

12        Q.   For the full day?

13        A.   Not the amounts, however.  It was like we

14   had to claim $2 for how many hours we worked as a

15   Delta tech.

16        Q.   What do you mean you had to claim $2 for

17   every hour you worked as a Delta tech?

18        A.   So if I was going to be down there for

19   three hours, I had to claim $2 for each hour.

20        Q.   Why did you have to claim $2 for each

21   hour?

22        A.   That's what I was told.

23        Q.   Who told you that?

24        A.   Managers.

25        Q.   Which managers?
```

1            ESSENCE C. TAYLOR - BY MS. BASS

2        A.   Managers of the car wash.

3        Q.   Do you remember their names?

4        A.   Shane Oehlbeck.

5        Q.   I'm sorry.  What was the last name?

6        A.   Oehlbeck.  Greg Suraci.  It was so long

7   ago.

8             (There was a pause in the proceeding.)

9        A.   Zack Lamentia.  Richard Labonte.  Joshua

10  Ross.  You want me to name all of them?

11       Q.   I want just the managers who told you you

12  had to claim $2 an hour in tips.

13       A.   They all stressed that we had to make sure

14  that we claimed tips.

15       Q.   When you said they "stressed" that you had

16  to claim trips, what do you mean?  What did they say?

17       A.   "Make sure you claim your tips at the end

18  of your shift."

19       Q.   That was the words they used?

20       A.   Mm-hmm -- yes.

21       Q.   Who told you you had to claim $2 an hour?

22       A.   It's just something that I heard.

23       Q.   From?

24       A.   From a manager.  I don't know exactly

25  which manager, but that is something that I remember

1            ESSENCE C. TAYLOR - BY MS. BASS

2    being told.

3            Q.   From a manager?

4            A.   Yes.

5            Q.   But you don't remember which manager?

6            A.   No.

7            Q.   Was it one manager, was it more than one?

8            A.   More than one.

9            Q.   And when did they tell you that?

10           A.   We would have OSHA meetings, and I recall

11   that being something that they told us at the

12   meetings.

13           Q.   What's an OSHA meeting?

14           A.   I don't know what OSHA stands for.  But it

15   was just a meeting that we had every year, basically

16   like to review certain rules and regulations.

17           Q.   What kind of rules and regulations?

18           A.   Such as tip claiming, appropriate uniform

19   attire, appropriate conduct.

20           Q.   And who led those meetings?

21           A.   Usually the managers did.

22           Q.   Which managers?

23           A.   The managers of the car wash.

24           Q.   Like the one who was in charge of the

25   whole car wash?

```
 1                 ESSENCE C. TAYLOR - BY MS. BASS

 2          A.  Of the location.

 3          Q.  One manager led the meeting?

 4          A.  It was usually -- usually more than one

 5    manager.  They each had different things to say.

 6          Q.  Okay.  And were these meetings -- who else

 7    attended these meetings?

 8          A.  Just the managers and employees.

 9          Q.  When you say "employees," which employees?

10          A.  Whoever was employed by Delta-Sonic at

11    that location.

12          Q.  All the employees at the location?

13          A.  Yes.

14          Q.  And when they discussed tip claiming in

15    these meetings, what did they say?

16          A.  They just told us to make sure that we

17    claimed our tips.

18          Q.  Make sure that you claim?

19          A.  Our tips.

20          Q.  Your tips?

21          A.  Our tips at the end of our shifts.

22          Q.  And did that mean all your tips, some of

23    your tips?  Did they explain what that meant?

24          A.  If we were given wiping time, we had to

25    make sure that we wrote that down on the clipboard.
```

                    ESSENCE C. TAYLOR - BY MS. BASS

1

2          Q.   What do you mean, if you "were given

3    wiping time"?

4          A.   Or time at the exit to dry cars or detail

5    cars.

6          Q.   You had to write what down?

7          A.   Our tips.

8          Q.   And did they -- they just said, "At the

9    end of the shift claim your tips"?

10         A.   Yes.

11         Q.   So at what point did they tell you to

12   claim $2 an hour in tips?

13         A.   I recall that question being asked, how

14   much we should claim.  And they told us that it should

15   be -- we should be claiming $2 per hour.

16         Q.   A question was asked in one of these

17   meetings?

18         A.   Yes.

19         Q.   By who?

20         A.   An employee.

21         Q.   And who said they should be claiming $2 an

22   hour?

23         A.   One of the managers.

24         Q.   You don't know which one?

25         A.   No.

```
 1                ESSENCE C. TAYLOR - BY MS. BASS
 2          Q.   The location manager?
 3          A.   The location manager.  I recall this being
 4    at Irondequoit.
 5          Q.   So the location manager of Irondequoit
 6    told you to claim $2 an hour in tips?
 7          A.   Yes.
 8          Q.   Did he say "at least $2 an hour," or he
 9    just said, "You have to claim $2 an hour in tips"?
10          A.   "You have to claim $2 an hour in tips."
11          Q.   So is that what you did?
12          A.   That's what I wrote down on the clipboard,
13    yes.
14          Q.   Just $2 an hour?
15          A.   Yes.
16          Q.   Regardless of how much you made in tips?
17          A.   Yes.
18          Q.   What if you made zero dollars in tips?
19          A.   If I made zero dollars in tips and I was
20    down there for two hours, I would claim $4.
21          Q.   If you were working for two hours -- four
22    hours -- sorry, repeat that.
23          A.   If I was down there working two hours,
24    I would claim $2 for those hours.
25          Q.   Even if you made zero dollars?
```

1          ESSENCE C. TAYLOR - BY MS. BASS

2          A.   Yes.

3          Q.   There was never a time that you claimed

4    zero dollars in tips?

5          A.   I'm sure there was a time.

6          Q.   Why would you have claimed zero dollars in

7    tips?

8          A.   If I didn't make any money at the exit.

9               THE WITNESS:  Can we take a break, please?

10              MS. BASS:  Yes.

11              MR. CORDELLO:  Five, ten minutes?

12              MR. JANICIK:  Good.

13         (The proceeding recessed at 4:20 p.m.)

14         (The proceeding reconvened at 4:36 p.m.;

15         appearances as before noted.)

16              MS. BASS:  Ready?

17              MR. CORDELLO:  Yes.

18    ESSENCE C. TAYLOR, resumes;

19              CONTINUING EXAMINATION BY MS. BASS:

20         Q.   Okay.  Ms. Taylor, before we took a break,

21    we were talking about something that a manager told

22    you about claiming your tips.  And I want to make sure

23    I understand that correctly.

24         A.   (The witness indicated nonverbally.)

25         Q.   Did the manager tell you that you should

1                    ESSENCE C. TAYLOR - BY MS. BASS

2      be claiming $2 an hour in tips, or that you should be

3      making $2 an hour in tips?

4              A.   That we should be claiming that much.

5              Q.   That you should be claiming that much?

6              A.   (The witness indicated nonverbally.)

7              Q.   Regardless of how much you made?

8              A.   Regardless of how much we made while

9      wiping cars?  In tips, how much we made in tips?

10             Q.   Yes.  That's my question.

11             A.   I just remember being told that we have to

12     claim $2 per hour that we were down there.

13             Q.   No more, no less?

14             A.   No more, no less.  If we made nothing, we

15     would claim nothing.

16             Q.   So if you made zero, you would claim zero?

17             A.   Yes.

18             Q.   So you wouldn't always claim $2 an hour in

19     tips; sometimes you would claim zero?

20             A.   Mm-hmm.

21             Q.   What if you made $1 an hour in tips?

22             A.   Then we would claim $1.

23             Q.   $1.  So if you made less than $2 an hour

24     in tips, you claimed that amount?

25             A.   Yes.

```
 1                    ESSENCE C. TAYLOR - BY MS. BASS
 2          Q.  If you made more than that in tips, you
 3   only claimed $2 an hour?
 4          A.  Yes.
 5          Q.  So if you earned the $80 a day you were
 6   talking about during the busy month, when you worked
 7   six hours a day you would claim -- 6 times 2 is 12?
 8          A.  Yes.
 9          (There was a pause in the proceeding.)
10          Q.  This $2-an-hour rule, is this something
11   you discussed with other employees?
12          A.  No.
13          Q.  You never talked about this with anyone
14   else?
15          A.  No.
16          Q.  The manager just told you this in this
17   meeting --
18          A.  (The witness indicated nonverbally.)
19          Q.  -- and so that's what you did?
20          A.  Yes.
21          Q.  Was this in the beginning of your
22   employment?
23          A.  This has been throughout my whole six
24   years at Delta-Sonic that I've been under the
25   impression that I had to claim $2 per hour.
```

```
 1                   ESSENCE C. TAYLOR - BY MS. BASS

 2          Q.   Do you understand why the company wanted

 3   you to claim tips?

 4          A.   No.

 5          Q.   You don't know why they were telling you

 6   how much to write down?

 7          A.   I don't know.  No, I don't.

 8          Q.   They never explained to you that it was so

 9   they could make sure you were making at least minimum

10   wage?

11          A.   No.

12          Q.   They never explained to you it was so that

13   you could be taxed on your income?

14          A.   What do you mean?

15          Q.   That you would claim your tips so that

16   they could take out employment taxes on it?

17          A.   I do recall them telling us that claiming

18   tips, it was being truthful in how much we were

19   making, so that it's -- I mean, it's taxable income,

20   I believe.

21          Q.   What do you mean, they were saying "being

22   truthful" in how much you were claiming?

23          A.   Just claim how much we made so that it can

24   be taxable.

25          Q.   Who told you to claim how much you made?
```

```
 1                    ESSENCE C. TAYLOR - BY MS. BASS
 2            A.   Like I said, like at the meetings they
 3       told us to claim $2 per hour.  That's what I mean --
 4            Q.   Even if that's not how much you made?
 5            A.   No, that's what I mean by claiming how
 6       much we made.  Or claiming how much time we had wiping
 7       or detailing.
 8            Q.   So when they told you to claim how much
 9       you made, you interpreted that to be claim $2 an hour?
10            A.   Yes.
11            Q.   And you claimed $2 an hour even if you
12       made $80 an hour?
13            A.   Yes.
14            Q.   What did the clipboard look like that you
15       claimed your tips on?
16            A.   I believe it was a brown, like wooden-type
17       of material of a clipboard.
18            Q.   And what was on it?
19            A.   It was a packet.  It had all of our names,
20       all of the employees' names on there in alphabetical
21       order.
22            Q.   Anything else on the clipboard?
23            A.   No.  It was just -- I only went to my
24       name.  And it was kind of like a -- kind of like a
25       chart formation on the clipboard of like the day that
```

                    ESSENCE C. TAYLOR - BY MS. BASS

 1      correct?

 2           A.  Yes.

 3           Q.  Have you stayed in touch with any of the

 4      people that you worked with?

 5           A.  Yes.

 6           Q.  A few, a lot?  How many?

 7           A.  Enough.

 8           Q.  About how many, would you say?

 9           A.  I would say about ten.

10           Q.  Ten people.  When was the last time you

11      talked to someone from Delta-Sonic?

12           A.  I would say last week.

13           Q.  What did you guys talk about?

14           A.  Getting together.

15           Q.  Anything about the case?

16           A.  No.

17           Q.  Have you ever talked to any of them about

18      the case?

19           A.  I've mentioned to only about a couple that

20      there was a case against Delta-Sonic and asked them if

21      they were interested.

22           Q.  Anything else?

23           A.  No.

24           Q.  Do you understand what it means to bring a

```
 1              ESSENCE C. TAYLOR - BY MS. BASS
 2   class action?
 3         A.  Yes.
 4         Q.  What does it mean to you?
 5         A.  To represent all of those who have worked
 6   for Delta-Sonic.
 7         Q.  Do you know what your responsibilities are
 8   as a named plaintiff?
 9         A.  To speak on behalf of those individuals.
10         Q.  Any other responsibilities?
11         A.  No.
12         Q.  How did you meet your attorneys?
13         A.  I was mailed a letter to contact them.
14         Q.  What did that letter say?
15         A.  That they were reaching out to individuals
16   who have worked for Delta-Sonic within the past
17   I think six years, and to contact them if I wanted to
18   be of any help.
19         Q.  Did they say why they were reaching out to
20   people who worked at Delta-Sonic?
21         A.  Because there was a claim that was being
22   raised against Delta-Sonic.
23         Q.  What kind of a claim?
24         A.  I don't really recall what the letter said
25   about the claim.
```

```
 1                ESSENCE C. TAYLOR - BY MS. BASS
 2          Q.   Are you aware in this case that your
 3    attorneys filed for certification of one of the claims
 4    in the case?
 5          A.   What do you mean by that, by
 6    "certification"?
 7          Q.   That they asked the Court to allow it to
 8    move forward as a class action?
 9          A.   Yes.
10          Q.   Are you aware that it's just one claim
11    that they've moved to -- asked to move forward as a
12    class action?
13          A.   Yes.
14          Q.   Do you know which claim it is?
15          (There was a pause in the proceeding.)
16          A.   Not exactly.
17          Q.   Are you aware that they have not asked for
18    the claim involving your uniform pay to move forward
19    as a class action?
20          A.   Say that again.
21          Q.   Are you aware that your attorneys have not
22    asked that the claim involving uniform maintenance
23    move forward as a class action?
24          A.   No.
25          Q.   Tell me about the uniform you wore to
```

                    ESSENCE C. TAYLOR - BY MS. BASS

1

2    the job?

3            A.  No.

4            Q.  Did she tell you she knew other students

5    who worked there?

6            A.  No.

7            Q.  Did you know anyone who worked at the

8    Delta-Sonic at the time?

9            A.  No.

10           Q.  Tell me about your interview.  Do you

11   remember who you interviewed with?

12           A.  Yes.  His name was Andy Casciani.

13           Q.  And who is he?

14           A.  At the time he was the -- one of the

15   managers there, hiring manager I assume.

16           Q.  And in your interview, did he explain to

17   you how you would be paid as a Delta tech?

18           A.  I don't really recall if he went into

19   depth with me.

20           Q.  Did he say anything about pay?

21           A.  No, not that I can recall.

22           Q.  So you don't recall whether he went into

23   depth or whether he said anything at all?

24           A.  The most he could have said to me was that

25   I would be paid minimum wage.  But he never gave me a

1                    ESSENCE C. TAYLOR - BY MS. BASS

2     dollar amount.

3            Q.   You say "the most he could have said."

4     Does that mean you just don't remember?

5            A.   I just don't really remember.

6            Q.   Did you ask how you'd be paid?

7            A.   No.

8            Q.   Did he mention to you that you would earn

9     tips?

10           A.   No, because at that time I was being hired

11    as a cashier.

12           Q.   Why were you being hired as a cashier?

13           A.   I believe that was the position that I

14    applied for.

15           Q.   And then after you were hired, did you go

16    through some sort of orientation?

17           A.   Yes.

18           Q.   Tell me about that orientation.

19           A.   I know it took eight hours.   The

20    orientation was held at the Greece location.   I

21    remember watching like safety videos.   They told us

22    what was required for our uniforms.   And that's about

23    it.

24           Q.   Do you remember who conducted your

25    orientation?

1

2      A.   No.

3      Q.   A man or a woman?

4      A.   I remember there were I think two women

5  and one man.

6      Q.   Did they use a PowerPoint presentation?

7      A.   I don't remember if they did or not.

8      Q.   Did they discuss pay with you?

9      A.   I don't even remember that much.

10      Q.   Were you going through an orientation as a

11  cashier?

12      A.   Yes.  I think I was going through as a

13  cashier, but during the training they had us train in

14  different positions, different roles.

15      Q.   What different roles?

16      A.   Either a tech or a cashier.

17      Q.   Did you train as a tech?

18      A.   Yes.

19      Q.   Were you in orientation with other people

20  who were being hired as Delta techs?

21      A.   I believe so.

22      Q.   Did they discuss tips during the

23  orientation?

24      A.   No.

25      Q.   Is that a no, definitely, they did not

1              ESSENCE C. TAYLOR - BY MS. BASS

2    discuss tips, or you don't remember?

3          A.   I don't remember.  I remember being

4    trained down at the exit, wiping off cars, and

5    whatever tips I made I had to give them to the person

6    who was training me.

7          Q.   Who was training you?

8          A.   I don't remember.

9          Q.   A manager, another Delta tech?

10         A.   I believe another Delta tech.

11         Q.   Did that Delta tech tell you how it would

12   work when you were out of training?

13         A.   No.

14         Q.   Did he tell you that when you were out of

15   training you would keep your tips?

16         A.   Yes.

17         Q.   Other than when you were being trained at

18   the wash exit, did they discuss tips at all during

19   your orientation?

20         A.   Not that I can recall.

21         Q.   Did they discuss pay at all?

22         A.   Not that I can recall.

23         Q.   Did they explain to you that when working

24   in a tipped position, you would make a tipped pay

25   rate?

```
 1                ESSENCE C. TAYLOR - BY MS. BASS
 2        A.  No.
 3        Q.  That's a definite no, or you don't
 4   remember?
 5        A.  I don't remember.
 6        Q.  Did they explain to you that if you didn't
 7   make enough in tips to bring you up to minimum wage,
 8   the company would guarantee that you made minimum wage
 9   and pay you the difference?
10        A.  No.
11        Q.  Is that a no, not at all, or you don't
12   remember?
13        A.  I would say no, not at all.  I don't
14   remember having that conversation with anyone.
15        Q.  Ever?
16        A.  Ever.
17        Q.  Did you understand that the company paid
18   guaranteed pay?
19        A.  What do you mean by guaranteed pay?
20        Q.  Did you understand that if you didn't make
21   enough in tips while working in a tipped position,
22   that the company would pay you the difference to
23   ensure you made at least minimum wage?
24        A.  No.
25        Q.  Did anyone else other than this person at
```

```
 1                    ESSENCE C. TAYLOR - BY MS. BASS
 2      the wash exit tell you that you would get to keep all
 3      of the tips that you earned?
 4              A.   I don't remember.
 5              Q.   Did you take any notes during orientation?
 6              A.   No.
 7                   THE WITNESS:  Can we take a break?
 8                   MR. CORDELLO:  Yeah.  Sounds like a good
 9      idea.
10                   MS. BASS:  Off the record.
11              (The proceeding recessed at 5:13 p.m.)
12              (The proceeding reconvened at 5:32 p.m.;
13              appearances as before noted.)
14                   MS. BASS:  Back on.
15      ESSENCE C. TAYLOR, resumes;
16                   CONTINUING EXAMINATION BY MS. BASS:
17              Q.   Okay.  Ms. Taylor, before the break we
18      were discussing some of the things you may or may not
19      have been told during orientation about your pay.  And
20      I'm just trying to get an understanding of what your
21      understanding is of how you were paid, particularly
22      when you worked in a tipped position.
23              A.   Particularly working in a tipped position,
24      I knew I was being paid less than minimum wage.
25              Q.   Anything else you understood about your
```

1              ESSENCE C. TAYLOR - BY MS. BASS

2     says "AXI."

3              A.  Okay.

4              Q.  Under "Current" it says "$7.46."  What is

5     AXI?

6              A.  I believe that was commissions.

7              Q.  And then down lower where it says

8     "Commission" and it says "11.65," what did you

9     understand that to be?

10             A.  For it to be 11.65 in commissions.

11             Q.  Was there a difference between that

12    commission and the AXI?

13             A.  No.  I honestly never really understood

14    what the AXI was.

15             Q.  Did you ever ask anyone to explain that to

16    you?

17             A.  Yes.

18             Q.  Who?

19             A.  One of the managers who would better know

20    what it meant.

21             Q.  Did they explain that to you?

22             A.  Yes, but I didn't understand it.

23             Q.  So did you ask them to re-explain it?

24             A.  No.

25             Q.  What kinds of things did you earn

1                  ESSENCE C. TAYLOR - BY MR. CORDELLO

2      were employed by Delta-Sonic that were titled "Notice

3      and Acknowledgment of Pay Rate and Payday," to the

4      best of your memory?

5                  A.   No.

6                  Q.   Okay.  I'm going to show you what's been

7      marked as Defendant Exhibit Number 8.  This was from

8      your deposition this afternoon.  Why don't you take a

9      moment to familiarize yourself with that document.

10                 A.   Okay.

11                 Q.   This document is entitled an "Employee

12     Disciplinary Report"; is that correct?

13                 A.   Yes.

14                 Q.   And it said -- can you read for me the

15     sentence, the handwritten sentence that comes after

16     "What specific actions led to the policy violation"?

17                 A.   It says, "Drawer was $175 short" --

18     I don't -- "for shift, $50 under drawer.  Also did a

19     deposit at $500 in which there actually was $600."

20                 Q.   Can you explain to me what that means to

21     you?

22                 A.   If one were to do the math, it would just

23     sound like I was -- my drawer was $25 short.

24                 Q.   How did you figure that out?

25                 A.   Well, the 600, it was originally supposed

1                ESSENCE C. TAYLOR - BY MR. CORDELLO

2    to be a drop of 600 and the short said 175, which 50

3    was underneath the -- in the drawer, they're saying.

4    And then the rest of the 125, $100 of that was

5    actually part of a deposit, leaving only $25

6    unaccounted for.

7         Q.   Okay.  So is it fair to say that your

8    drawer was not $175 short?

9         A.   Yes.

10        Q.   Okay.  I'm going to show you what has been

11   marked as Defendant Exhibit 1.  This is the Class and

12   Collective Action Complaint in this matter.  Why don't

13   you take a moment to familiarize yourself with the

14   document.

15             I'd like you to pay special attention to

16   page 17, count 2.

17        A.   Okay.

18        Q.   And count 2 goes into page 18, too.

19        A.   Okay.

20        (There was a pause in the proceeding.)

21        A.   Okay.

22        Q.   Earlier this afternoon Ms. Bass asked you

23   some questions regarding your damages related to your

24   uniform claim.

25             Do you recall that?

1

2                    C E R T I F I C A T I O N

STATE OF NEW YORK:

3    COUNTY OF MONROE:

4              I, MARIA A. WOLCZYK, CRR, RPR, CSR, do

5    hereby certify that the foregoing testimony was duly

6    sworn to; that I reported in machine shorthand the

7    foregoing pages of the above-styled cause, and that

8    they were produced by computer-aided transcription

9    (CAT) under my personal supervision and constitute a

10   true and accurate record of the testimony in this

11   proceeding;

12             I further certify that the witness

13   requests to review the transcript;

14             I further certify that I am not an

15   attorney or counsel of any parties, nor a relative or

16   employee of any attorney or counsel connected with the

17   action, nor financially interested in the action;

18             WITNESS my hand in the City of Rochester,

19   County of Monroe, State of New York.

20

21

22

23

     MARIA A. WOLCZYK, CRR, RPR, CSR

24   Freelance Court Reporter and

     Notary Public No. 01WO4638658

25   in and for Monroe County, New York

# EXHIBIT 2

1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - -

ESSENCE TAYLOR and DANIEL CASHMAN, on behalf of
themselves and all other employees similarly
situated,

        Plaintiffs,

          Civil Action No. 6:14-cv-06698-MAT

v.

BENDERSON PROPERTIES, INC., DELTA-SONIC CAR WASH
SYSTEMS, INC., and RONALD BENDERSON,

        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - -

Deposition Upon Oral Examination Of:
        Daniel J. Cashman

Location:      Cordello Law PLLC
              693 East Avenue, Suite 220
              Rochester, New York 14607

Date:          June 29, 2015

Time:          9:30 a.m.

Reported By:  Maria A. Wolczyk, CRR, RPR, CSR

A P P E A R A N C E S

Appearing on Behalf of Plaintiffs:

Justin M. Cordello, Esq.

    Cordello Law PLLC

    693 East Avenue, Suite 220

    Rochester, New York  14607


Robert L. Mullin, Esq.

    Ferr & Mullin, P.C.

    7635 Main Street

    Fishers, New York  14453



Appearing on Behalf of Defendants:

Doug Janicik, Esq.

Erin Norris Bass, Esq.

    Steptoe & Johnson, LLP

    201 East Washington Street, Suite 1600

    Phoenix, Arizona  85004-2382



Also Present:

Paul Lutz, Delta-Sonic Car Wash Systems, Inc.

*       *       *

```
 1                DANIEL J. CASHMAN - BY MR. JANICIK

 2          Q.   What about, in this case there are

 3     12 other employees that have filed with the Court an

 4     opt-in notice, saying essentially they want to

 5     participate in the case.  Do you know any of them?

 6          A.   No.  I just found out about the 12

 7     yesterday.

 8          Q.   Okay.

 9          A.   So I have not seen a list of who they are,

10     so I cannot tell you if I know who they are.

11          Q.   Okay.  We'll run down real quick.

12               Andrew Tillinghast?

13          A.   What location did he work at?

14          Q.   He worked at Orchard Park.

15          A.   No.

16          Q.   Ayzia Jacobs from Buffalo?

17          A.   No.

18          Q.   And for all these people --

19          A.   If it's not from Rochester, I probably

20     don't know them.

21          Q.   Okay.

22          A.   So if there's any from Rochester, feel

23     free to --

24          Q.   I'll just run down.

25               Amanda Conteh from Buffalo?
```

1          DANIEL J. CASHMAN - BY MR. JANICIK

2          identification:  Defendants EXH 2.)

3          Q.  Okay.  Mr. Cashman, do you recognize the

4     document I put in front of you?

5          A.  Mm-hmm.

6          Q.  Okay.  And what is that document?

7          A.  This is a pay statement.

8          Q.  Is it one of your pay stubs?

9          A.  It appears to be, yes.

10         Q.  And in the upper right corner it says,

11    "Pay Statement, Period Start Date May 3rd, 2014,

12    Period End Date May 9, 2014."

13              Do you see that?

14         A.  Yes.

15         Q.  And the pay date is May 16th, 2014?

16         A.  Okay.

17         Q.  And the document number underneath that is

18    "248669," do you see that, right under the "Pay Date"?

19         A.  Oh, 248669.  Yes.

20         Q.  If you look under "Earnings" on the left

21    side where it shows the different categories of "Pay

22    Type," about halfway down it says "Guarantee."

23              Do you see that?

24         A.  Yes, I do.

25         Q.  Okay.  If you go over to the right under

1              DANIEL J. CASHMAN - BY MR. JANICIK

2      the column "Current" there's a number that is $1.61.

3              Do you see that?

4          A.  Yes, I do.

5          Q.  Is it your understanding that that is the

6      amount that Delta-Sonic paid to you in order to get

7      you to the minimum wage amount for that week?

8              (There was a pause in the proceeding.)

9          A.  Apparently.

10         Q.  Let me ask you this:  What was your

11     understanding of "guarantee pay" at Delta-Sonic?

12         A.  That if I don't make $8 an hour, which was

13     at the time that this pay stub came out the current

14     minimum wage, they would make sure I got $8 an hour.

15         Q.  So you understood that the minimum wage at

16     this time was $8 per hour?

17         A.  Correct.

18         Q.  Okay.  So that guarantee pay on here of

19     $1.61 would reflect the amount that Delta-Sonic had to

20     pay you in order to get to $8 per hour for that week?

21         A.  Correct.  But I don't see where on this it

22     also says what that difference would be if -- had I

23     not gotten a tip credit, or that guarantee pay.  What

24     the difference between minimum wage is and what the --

25     or what they pay us and the minimum wage.

```
 1              DANIEL J. CASHMAN - BY MR. JANICIK
 2         A.   Correct.
 3         Q.   Okay.  What are the other misdoings --
 4         A.   The third one is the fact during training
 5   they never told us -- or any manager told us the
 6   difference between the hourly rate that we'd be
 7   getting paid and minimum wage and what that
 8   difference, the makeup credit would be.
 9         Q.   Okay.  Let's explore that for a second.
10              This is before you began -- you're
11   referring to training before you began working; right?
12         A.   Correct.
13         Q.   And I understand you're saying the
14   difference between the tipped rate, what they would be
15   paying, and then the minimum wage?
16         A.   Correct.
17         Q.   And then you say, what the amount of the
18   makeup pay would be.  How would the company know that
19   before you started work?
20         A.   They would know what it would be per hour.
21   You get -- they say you get paid X amount to do this
22   job.  Here's minimum wage.  What's the difference?
23              I mean, they never explicitly said what
24   that difference in pay would be.
25         Q.   You can't take $8 minus 6.05 and see that
```

1           DANIEL J. CASHMAN - BY MR. JANICIK

2    it's $1.95?

3           A.  That's not my job.

4           Q.  But that's the basis of your claim, is

5    that -- at training, at least for this third misdoing,

6    that nobody told you that 8 minus 6.05 is $1.95; is

7    that correct?

8           A.  That's correct.

9           Q.  Okay.  Three misdoings.  Any other

10   misdoings?

11          A.  That is it.

12          Q.  Okay.  So you don't have any claim for

13   overtime; is that correct?

14          A.  Correct.

15          Q.  Any claim for off-the-clock work, work

16   that they made you do after you clocked out?

17          A.  No.

18          Q.  Okay.  Did that ever happen to you?

19          A.  No.

20          Q.  Okay.  Any claim for commissions that you

21   weren't paid while you were in a position that paid

22   commissions?

23          A.  I never really tracked those that closely.

24          Q.  Okay.  But as you sit here today, you're

25   not aware of any unpaid commissions?

```
 1              DANIEL J. CASHMAN - BY MR. JANICIK

 2         A.   I have not specifically reviewed that.

 3         Q.   Were you aware that the request is seeking

 4   to certify a class on just the pay stub claim?  I'll

 5   refer to the pay stub claim being the missing

 6   information that you're referring to between the tip

 7   rate and the minimum wage.

 8              Were you aware that the request to certify

 9   a class is only on that claim and not on the uniform

10   claim and not on the training notice claim?

11         A.   I was not instructed on that.

12         Q.   Other than New York employees, are there

13   any other employees from another state that are a part

14   of this case?

15         A.   Not that I'm aware of.

16         Q.   So to your knowledge, this case is about

17   New York employees?

18         A.   Correct.

19         Q.   You worked for Delta-Sonic until about

20   early January 2015; is that correct?

21         A.   Correct.

22         Q.   Okay.  Why did your employment end?

23         A.   I could not find reliable transportation

24   so I could not make it to work.

25         Q.   Okay.  So you just stopped coming in?
```

```
 1              DANIEL J. CASHMAN - BY MR. JANICIK
 2    people do that.
 3         Q.   When you say you've "seen people do that,"
 4    you're referring to their paychecks, not your
 5    paycheck?
 6         A.   Correct.
 7         Q.   Okay.  So we're only talking about your
 8    paychecks here for now.
 9              You never had to complain to HR that
10    something was wrong on it?
11         A.   No.  But then again I never followed them
12    to a point where I sat there with a calculator and
13    made sure everything was proper.
14         Q.   Did you have any -- in terms of just
15    what -- the money you took home, did you ever think at
16    any time that it wasn't at least minimum wage?
17         A.   I can't tell you.  I never focused too
18    much on it.
19         Q.   In this case we have produced your pay
20    stubs dating back to your first day of work.  Have you
21    reviewed those as part of this case?
22         A.   I saw them when they came out in the
23    system... the Utilipro [sic] system, but I have not
24    seen them since then.
25         Q.   When they came out of the system, are you
```

1

2                    C E R T I F I C A T I O N

STATE OF NEW YORK:

3   COUNTY OF MONROE:

4                I, MARIA A. WOLCZYK, CRR, RPR, CSR, do

5   hereby certify that the foregoing testimony was duly

6   sworn to; that I reported in machine shorthand the

7   foregoing pages of the above-styled cause, and that

8   they were produced by computer-aided transcription

9   (CAT) under my personal supervision and constitute a

10  true and accurate record of the testimony in this

11  proceeding;

12               I further certify that the witness

13  requests to review the transcript;

14               I further certify that I am not an

15  attorney or counsel of any parties, nor a relative or

16  employee of any attorney or counsel connected with the

17  action, nor financially interested in the action;

18               WITNESS my hand in the City of Rochester,

19  County of Monroe, State of New York.

20

21

22

23

    MARIA A. WOLCZYK, CRR, RPR, CSR

24  Freelance Court Reporter and

    Notary Public No. 01WO4638658

25  in and for Monroe County, New York

# EXHIBIT 3

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| ESSENCE TAYLOR and DANIEL CASHMAN *on behalf of themselves and all other employees similarly situated,*<br><br>Plaintiffs,<br><br>v.<br><br>DELTA-SONIC CAR WASH SYSTEMS, INC., and RONALD BENDERSON,<br><br>Defendants. | **SECOND DECLARATION OF BRIAN EVERS**<br><br><br>Civil Action No.<br>6:14-cv-06698-MAT-JWF |

STATE OF NEW YORK        )
                                              ) ss:
County of Monroe            )

I, Brian Evers, am over the age of 18, have personal knowledge of the facts stated herein, and am capable of making this declaration.

1.      I am the Vice President and Chief Financial Officer of Delta-Sonic Car Wash, Inc. ("Delta-Sonic"). I have served in that role since June 2003.

2.      When a Delta-Sonic manager disciplines an employee, the manager fills out an Employee Disciplinary Report or Committee Meeting Report (depending on the level of discipline), discusses it with the employee, and then puts the form in their personnel file. Attached as Exhibit A are copies of the discipline forms in Essence Taylor's personnel file.

I declare under penalty of perjury that the foregoing is true and correct. Executed on July 14, 2015.

_____
Brian Evers

8541132

# EXHIBIT  A

## Counseling/Training Sessions

Date: 3/25/08

Counseling / Training (circle one)

Employee Name: ESSENCE TAYLOR

Follow-Up Date: 3/25/08

Supervisor Name: ANDREW J. CASCIANI

**Problem to be addressed:**

ALWAYS ON CELL PHONE / OR TEXTING WHILE AT WORK OR IN BATHROOM (ON BATHROOM BREAK) UNACCEPTABLE TO BE ON PHONE AT WORK MAKEING CUSTOMER WAITFOR SERVICE WILL RESULT IN You LOSING YOUR JOB

**Consequences if the problem continues:**

COMMITEE MEETING AND SUSPENSION

**Actions the employee must take to correct the problem:**

Essence will no longer have phone on her at Work. That will resolve her from texting in the bathroom talking on the phone, she knows what she needs to do when using Delta sonic sales approach as well. She will be more enthusastic and go above & beyond.

| | | |
|---|---|---|
| Essence Taylor | Essence Taylor | 3-25-08 |
| Employee Signature | Employee Name PRINTED | Date |
| Andrew J. | AJC | 3/25/08 |
| Supervisor Signature | Supervisor Name PRINTED | Date |

DS0000110

**delta sonic**   **EMPLOYEE DISCIPLINARY REPORT**   **delta sonic**

Employee Name: _Essence Taylor_   Date: _7/14/08_

Location: _I.P #815_   Violation Observed by: _Shane ochibene_

Level of Discipline Imposed: (Check all that apply)

_____ Verbal Warning   _X_ Written Warning   _____ Final Written Warning

_____ Suspension Pending a Committee Meeting

Note: All Disciplinary reports will be reviewed by the District Manager to determine if a committee should be formed to take further action.

Violation of Which Policy and Policy #: _Policy # 20. unsatisfactory performance_
_or conducts_

What specific actions lead to the policy violation: _Drawer was $175 short from_
_shist. $50 under Drawer you also did a deposit of $500_
_in which their actually was $600._

Corrective Action to Ensure No Repeat Violations Occur: _First of all, you never_
_do a drop of $600. we do drops at $100-200. atleast at_
_the end of your shift. check your under your drawer. Be more careful_
_with your drops and double count it necessary._

What Action Will Take Place for Repeat Offenses: Further disciplinary action up to and including termination.

_AOC_   _7/14/08_
Signature of Supervisor/DM/Director   Date Signed

I have read and understand the information in the disciplinary report.

_Essence Taylor_   _July 17th 2008_
Signature of Employee   Date Signed


_____   _____
District Manager/Director Review   Date Signed


_____   _____
Human Resources Review   Date Signed

Confidential   DS0000179

## delta sonic — EMPLOYEE DISCIPLINARY REPORT — delta sonic

**Employee Name:** Essence Taylor          **Date:** 7/17/9

**Location:** IR 815          **Violation Observed by:** Sandra Ooley

**Level of Discipline Imposed:** (Check all that apply)

X   Verbal Warning          _____ Written Warning          _____ Final Written Warning

_____ Suspension Pending a Committee Meeting

**Note:** All Disciplinary reports will be reviewed by the District Manager to determine if a committee should be formed to take further action.

**Violation of Which Policy and Policy #:** 3.1 unsatisfactory or careless work failure to meet production or quality standards as explained by your supervisor. Cash handling issue.

**What specific actions lead to the policy violation:** Shift for 7/16/9 was 25°° Short, No explanation why

**Corrective Action to Ensure No Repeat Violations Occur:** Next shortage will result in a committee meeting.

**What Action Will Take Place for Repeat Offenses:** Further disciplinary action up to and including termination.

_____          07 17 09
**Signature of Supervisor/DM/Director**          **Date Signed**

I have read and understand the information in the disciplinary report.

_____          7/19/09
**Signature of Employee**          **Date Signed**

_____          7/24/09
**District Manager/Director Review**          **Date Signed**

_____          _____
**Human Resources Review**          **Date Signed**

Confidential

DS0000106

## Counseling/Training Sessions

Date: _11-02-09_                     Counseling / Training *(circle one)*

Employee Name: _TAYLOR, ESSENCE_      Follow-Up Date: _N/A_

Supervisor Name: _S. NASSER_

**Problem to be addressed:** _ALLOWING EMPLOYEES TO LOITER IN THE_
_STORE, WHICH IN TURN AFFECTS YOUR PRODUCTIVITY AND ALLOWING_
_AN EMPLOYEE TO NOT ONLY PURCHASE LOTTERY SCRATCH OFF'S_
_IN UNIFORM BUT ALLOW THEM TO STAY IN STORE & PLAY_
_THEM._

**Consequences if the problem continues:**
_COMMITTEE MTG._

**Actions the employee must take to correct the problem:**
_IF ANY EMPLOYEE IS HANGING AROUND SHE WILL ASK HIM_
_TO LEAVE._

| | | |
|---|---|---|
| Employee Signature | Essence Taylor | 12/5/09 |
| | Employee Name PRINTED | Date |
| Supervisor Signature | STEVEN A. NASSER | 12-06-09 |
| | Supervisor Name PRINTED | Date |

Confidential

DS0000105

**delta sonic** | **EMPLOYEE DISCIPLINARY REPORT** | **delta sonic**

Employee Name: _Essence Taylor_     Date: _2-5-11_

Location: _Iron 85_     Violation Observed by: _Amanda / Training Support Center_

Level of Discipline Imposed: (Check all that apply)

_____ Verbal Warning     _X_ Written Warning     _____ Final Written Warning

_____ Suspension Pending a Committee Meeting

Note: All Disciplinary reports will be reviewed by the District Manager to determine if a committee should be formed to take further action.

Violation of Which Policy and Policy #: _Proper store cashier sales approach._

What specific actions lead to the policy violation: _Listen in Jan 26 2011._
_did not mention gas discount with wash or_
_raincheck_

Corrective Action to Ensure No Repeat Violations Occur: _Would you like to_
_save on your gas today with a wash or raincheck?_

What Action Will Take Place for Repeat Offenses: Further disciplinary action up to and including termination.

_Amanda Hughes_     _2/8/11_
Signature of Supervisor/DM/Director     Date Signed

I have read and understand the information in the disciplinary report.

_Essence Taylor_     _2/8/11_
Signature of Employee     Date Signed

_____     _____
District Manager/Director Review     Date Signed

_____     _____
Human Resources Review     Date Signed

Confidential

DS0000097

## Employee Disciplinary Report

Employee Name: Essence Taylor       Date: 3/5/11
(Use full legal name)

Location: Webster 829       Violation Observed by: _____

Level of Discipline Imposed: (Check all that apply)
** Review prior violations when determining level of discipline**

[✓] Verbal Warning       [ ] Written Warning       [ ] Final Written Warning

[ ] Suspension Pending a Committee Meeting   [ ] Committee Meeting- No Suspension

Violation of which policy and policy #: 17 unsatisfactory performance...

Specific actions leading to the policy violation:
Employee did not use credit card slider for manual credit, in result the information on the slip was invalid.

Corrective action(s) directed to ensure no repeat violations occur:
Talk to employee and remind her of the policy.

I have read and understand the information in the disciplinary report.

_____       _____
Signature of Employee       Date Signed

_____       _____
Signature of Supervisor/DM/Director       Date Signed

_____       _____
Signature District Manager/Department Head       Date Signed

Confidential



# Employee Disciplinary Report

**Employee Name:** Essence Taylor   **Date:** 3/1/2012
(Use full legal name)

**Location:** Wb 829   **Violation Observed by:** J Schoepfel

**Level of Discipline Imposed: (Check all that apply)**
** Review prior violations when determining level of discipline**

☐ Verbal Warning   ☐ Written Warning   ☐ Final Written Warning

☒ Suspension Pending a Committee Meeting   ☐ Committee Meeting- No Suspension

Violation of which policy and policy #:

18. Using a cell phone or any other unauthorized electronic device during work hours without prior approval

Specific actions leading to the policy violation:

On 3/1/12 Essence was organizing the candy sitting and had her personal cell phone in her lap.

Corrective action(s) directed to ensure no repeat violations occur:

Cell phones are not allowed on property.

I have read and understand the information in the disciplinary report.

_Essence Taylor_                    _3/1/12_
Signature of Employee                Date Signed

_JSchoepfel_                         _3/1/12_
Signature of Supervisor/DM/Director   Date Signed

_____                   _3/2/12_
Signature District Manager/Department Head   Date Signed

DS0000091

## Delta Sonic Car Wash Systems Inc.
## Committee Meeting Report

| Name: ESSENCE TAYLOR | Date: 03/03/2012 |
|---|---|
| Location: WB 8294 | Supervisor: JONI SCHOEPFEL |

Introduction to the committee process Delta Sonic uses a committee meeting format as a dispute resolution system. Whenever a personnel matter arises, a committee is formed to investigate unresolved problems and make decisions to determine an appropriate result. The employee's Supervisor may call a committee meeting or a meeting can be directly requested by any employee. The employee can request a meeting either through his/her Supervisor or the Human Resources Department. If the decision has been made to have a committee meeting then either the employee's District Manager/Department Head or the Human Resources Department will select the committee members, to include at least one District Manager/Department Head as a voting committee member. If the employee has a problem with any of the committee members, he/she can contact the Human Resources Department to request a replacement. The employee will be given advance notice of a committee meeting, and the subject of the committee meeting in order to prepare a response. You may also be given the opportunity to waive the advance notice to have the committee meeting immediately if sufficient members of management can be present. The usual size of the committee is three members, but more may be included depending on the situation. During the committee meeting, information from the investigation will be discussed to help determine a result. Committee decisions are determined by vote. A majority vote is required to affirm a decision. In most cases, decisions are determined by consensus. The result of the committee meeting is final. If at a later date new information is presented or time has changed circumstances, you can contact Human Resources who can then determine if the original committee will reconvene. Complete confidentiality is expected for all committee matters.

**Violation of which policy and policy number:** 18- Using a cell phone or any other unauthorized electronic during work hours without prior approval.

**Specific actions that led to this committee:** On 03/01/2012, Essence was witnessed organizing candy sitting down with her personal cell phone in her lap by Joni Schoepfel. Last month, a posting went up that stated you were not authorized to use your cell phone. You signed off on this. You were also written up in December 2011 for using your cell phone while you were being listened to for your customer friendly bonus.

Confidential

DS0000093

**Employee Response-**
(Notes taken by a member of the committee. Write legibly & include a summarized response for each item).

I admit that I had my phone out on 03/01 and I knew it was wrong. You never told me about the verbal warning in December. I was told that it was someone in the store but it was not me. I never recall being told this. I would have definitely remembered doing this. I understand the policy. I have been here for almost five years.

I feel like I have been working here for awhile and I do not feel that me and other people are not being recognized for what we do. No one has every told me how I am doing. When something bad happens the attention are brought to me. My managers in the store all get recognized for what they do and it has always been that way. If you do not have a title in this company you do not get much.

**Employee Signature:** Essence Taylor   **Date:** 3/3/2012

**Notes taken by:** ADAM M BAUMGARTNER

DS0000094

If the committee determines not to disclose the decision or needs more time to deliberate, issue the employee a completed Committee Meeting Follow Up Response Form. Scan & email all committee meeting information to hr@deltasoniccarwash.com and call Human Resources ASAP. HR will then communicate the final decision to the employee. This process is at the discretion of the committee members.

| **\*Optional\*** Employee was issued a Committee Meeting Follow Up Response Form & directed to contact HR on: |
|---|
| Date:           Time: |

| **Results/Decision of the Committee:** Fill in one of the below sections and put a reason for decision. |
|---|

| Termination ☐ | Auto termination- (Employee did not show) ☐ |
|---|---|
| *If employee does not show for committee- this is an <u>involuntary</u> termination, not a voluntary quit. Supervisor must note that in Ultipro* | |

If Termination, which <u>one</u> policy violation was the termination based on:

Why did the committee decide to terminate the employee based on this policy violation?

| Demotion ☐       (New position) | Probation ☐       (length of time) | Suspension ☐       (length of time) |
|---|---|---|
| (NY ONLY- INFORM HR IMMEDIATELY FOR ANY DEMOTIONS- EMPLOYEE NEEDS PAY ACKNOWLEDGEMENT SIGNED ASAP) | | |
| Final Written Warning ☒ | Transfer ☐ to: | Other: (Explain) |

Why did the committee decide to take one of these above actions? Essence admitted that she made a mistake and said that it would not happen again.

Post Committee Meeting Reminders for Supervisor/DM/Dept Head:
☒Employee was punched into Sitewatch and was paid for their time at the committee meeting.
☐Status Change was done in Ultipro Web. Status changes need to be done immediately.

\*Management Demotion/Termination only:
☐Passwords were changed for Gmail and Location Alarm Code. Notify L.P. Dept.
☐Company property (keys, phone, etc) was collected.

| Committee Members ONLY: | | |
|---|---|---|
| Print Name | Signature | Date |
| Committee Member<br>JONI SCHOEPFEL | *Schoepfel* | 03/03/2012 |
| Committee Member<br>ADAM M BAUMGARTNER | *signature* | 03/03/2012 |
| Committee Member<br>RICK CAROSA | *R Carosa* | 03/03/2012 |
| Human Resources Review | | |

Confidential

DS0000095

**Delta Sonic Car Wash Systems Inc.**
**Committee Meeting Process Checklist:**

Upon receiving approval from your District Manager/Dept. Head to conduct a Committee Meeting, refer to the below guidelines to coordinate the Committee Meeting process:

<u>Employee Notification:</u>

- If the violation is observed by a member of management <u>other than the Supervisor</u>, contact DM/Dept Head to discuss appropriate disciplinary action. This member of management is permitted to ONLY inform the employee: "You are being sent home for the day, please call (supervisor) tomorrow in regards to the corrective action that will be taking place."

- If the violation is observed by the Supervisor, then the Supervisor must immediately inform the employee that a suspension (if applicable) and committee meeting will be conducted as part of the corrective action process. The Supervisor should ask the employee to sign off on an Employee Disciplinary Report and take possession of all company property- keys, equipment, tools, phones, etc and notify the employee that those items will be returned pending the results of their committee. Refer to the Corrective Action Guidelines.

- To provide management with time to coordinate the committee meeting, instruct the employee to contact you on a specific (date) and (time) within 48 hours of the original violation. At that point you can remind the employee that Delta Sonic uses a committee meeting process as the dispute resolution system and then explain the below information to the employee:

  ☒ Explain the specific policy violation <u>and</u> a brief summary of the subject matter.
  ☒ Inform employee who will be in the committee meeting and if the employee has a problem with any of the committee members, he/she can contact HR.
  ☒ Give date and time that it will be held. (Employee must have advanced notice)
  ☒ If they are being suspended, explain the length and reason of their suspension.
  ☒ Employee should refrain from coming to the location until their meeting.
  ☒ Explain the importance of confidentiality- not permitted to discuss the matter..
  ☒ Employee should attend committee meeting in full uniform. (Field only)
  ☒ Employee will be paid for the time spent at the committee meeting.
  ☒ For more information about the committee process, refer to employee handbook.

Please document the date, time and who communicated the above information:
DATE & TIME: 3/3/12 9AM   PRINT NAME: Vasquez

**At the start of the committee meeting, (if applicable or if it is a member of management) take possession of all company property- keys, equipment, tools, phones, etc and notify the employee that those items will be returned pending the results of their committee. **

Note- Forward all pages including this page to Human Resources.

DS0000096



# Employee Disciplinary Report

**Employee Name:** ESSENCE TAYLOR          **Date:** 04/12/2012
(Use full legal name)

**Location:** WB 829          **Violation Observed by:** MYSTERY SHOPPER

**Level of Discipline Imposed: (Check all that apply)**
** Review prior violations when determining level of discipline**

☒ Verbal Warning     ☒ Written Warning     ☐ Final Written Warning

☐ Suspension Pending a Committee Meeting     ☐ Committee Meeting- No Suspension

**Violation of which policy and policy #:**

17. Unsatisfactory performance of job duties or conduct; failure to meet production or quality standards as explained to you by your supervisor.

**Specific actions leading to the policy violation:**

On 04/3/2012, you were mystery shopped and received an "average" score (1/4 points) with the customer stating "Essence, the cashier, could have been a little friendlier during the transaction." ALSO, YOU DID NOT OFFER THE GAS DISCOUNT.

**Corrective action(s) directed to ensure no repeat violations occur:**

MAKE SURE YOU ARE OVERLY FRIENDLY TO EVERY CUSTOMER

I have read and understand the information in the disciplinary report.

_____          _____
Signature of Employee                                    Date Signed

_____          4/12/12
Signature of Supervisor/DM/Director                Date Signed

_____          _____
Signature District Manager/Department Head      Date Signed

Confidential



## Employee Disciplinary Report

**Employee Name:**      **Date:** 5-4-12
Essence Taylor

**Location:**   Webster      **Violation Observed by:** Danielle Coro

**Level of Discipline Imposed: (Check all that apply)**
** Review prior violations when determining level of discipline**

☐ Verbal Warning    ☒ Written Warning    ☒ Final Written Warning

☐ Suspension Pending a Committee Meeting   ☐ Committee Meeting- No Suspension

**Violation of which policy and policy #:**

#17 unsatisfactory performance of job duties…

**Specific actions leading to the policy violation:**

Essence received a "no" on her listen on Tuesday, May 1. Training support stated that she wasn't offering the gas discount.

**Corrective action(s) directed to ensure no repeat violations occur:**

The cashier needs to fulfill all of her job duties, while being friendly and helpful. She needs to consistently offer the gas discount to every customer. If she doesn't fulfill these expectations she could face consequences up to termination.

I have read and understand the information in the disciplinary report.

_Essence C. Taylor_        _5/16/2012_
Signature of Employee        Date Signed

_[signature]_        _5/16/12_
Signature of Supervisor/DM/Director        Date Signed

_[signature]_        _5/10/13_
Signature District Manager/Department Head        Date Signed

Confidential

DS0000088



## Employee Disciplinary Report

**Employee Name:**          **Date:** 5/6/12
Essence Taylor
**Location:**          **Violation Observed by:** Maurice Hendrix
Webster 829
**Level of Discipline Imposed: (Check all that apply)**
** Review prior violations when determining level of discipline **

☐ Verbal Warning     ☒ Written Warning     ☒ Final Written Warning

☐ Suspension Pending a Committee Meeting     ☐ Committee Meeting- No Suspension

**Violation of which policy and policy #:**

#17: Unsatisfactory performance of job duties…

**Specific actions leading to the policy violation:**

On Thursday March 27th, Essence was told to count down her drawer 15-30 minutes prior to end of her shift.. Essence thought that she could leave early since she counted down her drawer. Shortly after she was told she would not be leaving early, she became very upset. When asked to throw out trash in the back room she began throwing and kicking items in the backroom. She was also asked to put away an order and refused saying "I'm not doing that"

**Corrective action(s) directed to ensure no repeat violations occur:**

Essence needs to start any tasks given by management without question or hesitation and without damage or misuse or any Delta Sonic equipment or property. If this behavior continues you may face up to and including termination.

I have read and understand the information in the disciplinary report.

_Essence C. Taylor_                    _5/6/2012_
Signature of Employee                    Date Signed

_____                    _5/12/12_
Signature of Supervisor/DM/Director                    Date Signed

_____                    _5/13/12_
Signature District Manager/Department Head                    Date Signed

Confidential



# Employee Disciplinary Report

**Employee Name:**      **Date:** 5/20/12
Essence Taylor

**Location:** Webster      **Violation Observed by:** Danielle Coro

**Level of Discipline Imposed: (Check all that apply)**
** Review prior violations when determining level of discipline**

☐ Verbal Warning      ☐ Written Warning      ☒ Final Written Warning

☐ Suspension Pending a Committee Meeting      ☐ Committee Meeting- No Suspension

**Violation of which policy and policy #:**

> #17. Unsatisfactory performance of job duties or conduct; failure to meet production or quality standards as explained to you by your supervisor.

**Specific actions leading to the policy violation:**

> Essence received a "no" on her listen report. She was asking customers "Which wash did you want?", not trying to upgrade washes and not offering extras to every customer.

**Corrective action(s) directed to ensure no repeat violations occur:**

> Essence will follow the method learned in training and not "take orders". Also, she realizes that if she doesn't follow the expectations of the C-Store team and receives another "no" she will be suspended pending a committee meeting which could lead up to termination.

I have read and understand the information in the disciplinary report.

_Essence Taylor_        _5/22/12_
Signature of Employee        Date Signed

_[signature]_        _5/22/12_
Signature of Supervisor/DM/Director        Date Signed

_[signature]_        _5/22/12_
Signature District Manager/Department Head        Date Signed

Confidential

DS0000081



## Employee Disciplinary Report

**Employee Name:** ESSENCE TAYLOR      **Date:** 05/26/2012
(Use full legal name)

**Location:** WB 829              **Violation Observed by:** ADAM M BAUMGARTNER

**Level of Discipline Imposed: (Check all that apply)**
** Review prior violations when determining level of discipline**

☒ Verbal Warning      ☐ Written Warning      ☐ Final Written Warning

☐ Suspension Pending a Committee Meeting   ☐ Committee Meeting- No Suspension

Violation of which policy and policy #:

> 1- Violation of any company rule, policy, or procedure.

Specific actions leading to the policy violation:

> You did not fill out your tip sheet for week ending 05/25/2012. This is a common problem that we have previously discussed (documented in manager's journal).

Corrective action(s) directed to ensure no repeat violations occur:

> Fill out your tip sheet every shift that you work.

I have read and understand the information in the disciplinary report.

Signature of Employee _____      Date Signed _____

Signature of Supervisor/DM/Director _____      Date Signed 5/26/12

Signature District Manager/Department Head _____      Date Signed _____

Confidential